Before we begin our proceedings this morning, I'm going to turn it over to Judge Toronto for a motion. I have the honor of moving the admission to the bar of this court. My three law clerks, Seth Lloyd, Robbie Manasse, and Katherine Schlechzer. Before I formally do so, just a few words. It has been my privilege and my pleasure to work with them this past year. Each one has been a superb colleague, including in roles as advisor, scholar, critic, writer, and warm and light daily presence in a sometimes intense environment. For a year, I have benefited greatly from their commitment, their excellent work, and their good humor. I will miss them, and I envy all those who will be lucky enough to work with them as they move into promising careers. And I know that our court's bar will be brighter for their presence. With that, and on that basis, I move the admission of Katherine Schlechzer, who is a member of the bar and in good standing with the highest court of Massachusetts. Robert Manasse, who is a member of the bar and is in good standing with the highest court of the state of Washington. And Seth Lloyd, who is a member of the bar and is in good standing with the highest court of California. I have knowledge of their credentials, and I'm satisfied that each of them possesses the necessary qualifications. Let me just say that one of the best things about our job is that we not only get the delight of our own clerks in our chambers, but because we're all located in the same place, we get to know some of the clerks in other chambers as well. And so it's been my pleasure as well to get to know Judge Taranto's clerks. And on behalf of Judge Wallach, I enthusiastically grant the motion. Congratulations. Now turning to our cases for today, I'd like to thank all the parties for their cooperation in trying to get these sorted out. It remains to be seen whether we've done an effective job on that, but we've given it our best shot, and I appreciate the cooperation. So the first cases for argument are 14-1336 and 14-1639, progressive casualty versus liberty mutual. Now, Mr. Robesky, I understand you've reserved. We've got 20 minutes, 10 and 10, and then we'll hear from the government and the other side. Proceed. Thank you. Good morning, Your Honor. We would like to proceed first in case number 16-39, which is the case involving the Soffit IDSS. In that case, there was no substantial evidence, but rather hindsight reconstruction of a prior art mosaic to fill in the several gaps of Kosaka and RDSS combined. At page 34 of the blue brief in 16-39, you state that the aspirational generalizations of Geostar in K-10 suggest certain things, but bankruptcy showed Fazita at the relevant time would recognize those aspirations were not well-grounded. You don't have any authority for the proposition that accompanies bankruptcy undermines, for patentability purposes, the teachings of a corporate document. What kind of authority do you have for that? We don't have any authority for it except for common sense and logic. If there were an aspiration that was not fulfilled, then it was the market suggesting the aspiration was not well-grounded. And remember, Your Honor, this was an aspiration that was rejected by the PTAB, by the board, in their opinion, saying that beliefs were insufficient to find some type of motivation to comply. I can also direct the Court's attention to our chart that we have in the blue brief at page 39. That's the chart that lays out the mosaics of the various prior art references and the inferences that were drawn with hindsight with respect to Kosaka and RDSS in Claim 1. Can I just ask a follow-up question on the aspiration? If somebody states a plan for doing something, then subject only to uncertainty about how to do it, essentially an enablement question, why is that not enough to convey to a relevant, skilled artisan the idea of doing it? And I don't think I see an enablement problem here. So why isn't, as I say, an aspiration where there's no enablement issue about how to do what the aspirational document describes as something to be done enough? May I suggest, Your Honor, that on page 7418, if we look at the GeoSTAR document itself, we see that if we take Your Honor's proposition that it is aspirational, I do think that it's sufficient. I do think it's not enabling. Any less enabling than your own patent? Oh, much more so, Your Honor. How so? Because here there are two citations, one where the company believes the market exists in the insurance industry, and it says for the mobile processing of insurance claims. It doesn't suggest that this is going to be used for the type of wireless transmission and processing of data that's set forth in the patent. The same is true with some vague statement on 7418 that it would be used to lower insurance premiums. Remember, this is not even prior art, and it was rejected by the board as not being prior art. It was this aspiration, if you will, that led the board at the outset. We don't get to care about what led the board at the outset, do we? Well, I think it lays out the lack of a motivation to combine, because the care is this. The board originally said that there was a motivation to combine based on GeoSTAR. Then later, without GeoSTAR, and after reflecting on that and using the hindsight that it already had based on its viewpoint of GeoSTAR 10-K, it went back to fill in the gaps, which is what I directed the court to at page 39 of our brief, which is the substantial gaps that are missing from GeoSTAR and RDSS. The blue portion is what is in the Kosaka reference. The green portion is what's in GeoSTAR and RDSS, and the rest were gap filling that was used by the board looking at, in some cases, nothing more than a conclusory opinion of one of ordinary skills that didn't say would, but only said could. That kind of conclusory opinion is insufficient to support this piecing together of mosaics without a reason to combine. As we say on page 39, references such as a memory, that was brought in by a person of skill in the art. References or elements such as a wireless transmitter, only person of skill in the art. It was suggested there's a database in RDSS plus a person of skill in the art. If you look at these various pieces that were put together, this is not a simple combination of an aspiration from a 10-K statement and RDSS and Kosaka. This is a lot of gap filling, which is clear hindsight gap filling, we think. And all of these statements that I mentioned, the gap filling by Mr. Andrews, which was at the appendix at 7845-46. His gap filling simply says the would have recognized something, but would have recognized that something could be in a location, something could be this and that. Saying that one of ordinary skill would have recognized that something could be done is not a statement that one of ordinary skill would have recognized that that thing would have been done. And that's the test for obviousness, not that you could do it, but that you would do it upon looking at these references. And so we believe that this is total hindsight piecemeal reconstruction of claim one, using it as the frame, as some of the cases have said. The frame for constructing this mosaic of not only prior art, but prior art, conclusory opinions of experts. Can you give me, what was the page citation again for the declaration with all the could be's that you were referring to? 7845-46. It's paragraphs 37 and 38 of Mr. Andrews' opinion, of the declaration. Paragraphs? 37 and 38. So, if the court turns to 37, you see it's about four lines down. I'm sorry, can you give me the number again? I'm sorry, could you give us the number again? Yes, I would. 7845 and 46. So, 7845 is where 37 starts and expands over to 7846. The first location of could is on the top of 7846. Could be in the components, could be in a location remote from the censors, etc., etc. And then further down, about two, three, four, five, six lines up, premiums could be advantageously implemented. This is not a statement that it would have been, that one of ordinary skill would have done certain things. These are statements of could. Here's what I guess I want to try to break apart a little bit. One question is whether a person of skill in the art would have recognized a possibility, and the other is whether a person of skill in the art would have had a motivation to pursue the possibility. It seems to me that your argument is really about the motivation to pursue, and the first point about recognizing a possibility could be in a location isn't about that, but other things are about motivation to pursue the possibility, including the phrase could be advantageously. So those are two different things. So the fact that the first one doesn't address motivation doesn't seem to me to be certainly not decisive in saying that there's nothing else that supplies the motivation, and the second one actually does quite quietly address motivation by saying would have recognized an advantage in pursuing this possibility. Could be advantageously. What's wrong with that? Well, I think your analysis is correct, Your Honor, that our primary argument is the motivation combined. The board had found that the belief, the aspiration was insufficient, and so we support that, but it's not necessary that the court support that in order to find in our favor that there was no motivation combined. I see I have about 46 seconds left. I know the arguments with regard to new grounds for rejection surfaced in another group, but I don't know if you want to touch upon that here. I think I'll touch base on those in another appeal. The one thing I do want to mention, and this is in connection with the 1636 appeal, is that with respect to Nakagawa, this is claims 2 to 18, that we believe substantial evidence does not support the board's decision that the Nakagawa point system is selected vehicle data because those points that are calculated are the result of vehicle data processed in the vehicle and not in the server as required by the claims in element 1E, and there was no obviousness determination from the board. There was simply an anticipation determination that those points simply are not the type of selected vehicle data that's called for. I'm into my rebuttal time, and unless the court has questions. Can I ask you just one question? I think I know the answer, but sometimes one thinks things that are not right. If, unhappily for you, we disagree with you about 1639, we don't need to decide 1636 and 7, is that right? Let me take a look. We hope you don't do that, Your Honor, but 1639 covers all claims 1 through 20. Right, 36 and 37 are more limited. 36 and 37 are claims 2 to 18, 1, 19, 20.  Okay. Okay. Right here from the other side. May it please the court, Doug Hallward-Driemeier on behalf of Liberty Mutual. And starting, Judge Toronto, with your question, although there are three appeals, including the cross appeal, there is one issue in the 1639 appeal that disposes of all three, and that issue is the motivation to combine. Of course, that is a factual determination, one of pure facts, and reviewed very deferentially under the substantial evidence standard by this court. The board's determination that there was a motivation to combine is well-explained and well-supported in the record. The board did not... Can you sort of rehearse that motivation to combine based only on pre-priority date knowledge or sources? I would be happy to. The board started, as KSR suggests, with the nature of the interrelated teachings of RDSS and CASACA, and explains both of those pieces of prior art. Of course, both of them are systems of monitoring vehicle location and operation on the basis of sensors placed on the vehicle, and then each has a component of transmission with the outside, from the vehicle to the outside. So you have, at the outset, two systems that are very similar in their basic nature, being systems of vehicle monitoring for this same type of information, location, speed, acceleration, and the like. RDSS would track location through GPS and time. From that, you could obviously deduct speed. Speed is one of the things that is mentioned also in CASACA as being measured. So you have two systems that, at the very outset, have interrelated teachings. And then the board looked at the next thing that KSR tells us to look at, and that is the background knowledge of a poseda. Now, the board credited the testimony of Mr. Andrews, and specifically determined that one of ordinary skill in the art would have known that, quote, computing facilities located at a central station, that was how RDSS did it, can provide faster computation, bigger storage capacity, can also provide results to the system manager, for example an insurer, more rapidly and efficiently than computing facilities on the vehicle. So you had two systems that both had computing facilities to measure all this information about the cars. One of them had the computer located separately on each vehicle. And what Mr. Andrews, the expert, testified to, and the board credited, again, as a determination of fact, is that a person of ordinary skill in the art would have understood that combining all of that processing in a single supercomputer like RDSS, RDSS didn't just describe that, it already existed, was going to be more efficient in many ways. But not always. Intuitively, the combined efficiency is the processing plus how much stuff you need to transmit, and it might be that keeping all the processing of a big gob of data on the vehicle and then submitting a 3-bit number uses very much less bandwidth. So it's not obvious which would... That's true. It wouldn't always be better. That's true, and those were arguments that Progressive made, and the board considered them, and in fact there's 28 of them. The expert considered them too, though. The expert considered them first, and the board relied on Mr. Andrews' expert testimony, that, for example, with respect to the Doppler radar, that the Doppler radar information is already going to be processed. For purposes of insurance, one doesn't need all that data. All you need to know is was there a period in which the car was tailing too close to the car in front of it at a point in time, and so that would have been processed before sending it on. So that wasn't a reason. The board credited Mr. Andrews' testimony about that. And so the board... And again, the argument that Progressive is making is one of hindsight. Now, Liberty anticipated that that was going to be Progressive's argument, and so Liberty pointed to two things. First, it pointed to the RDSS prior art itself. That reference itself discloses that, an understanding that operations requiring extensive processing are performed at Geostar Central, rather than onboard each vehicle, reducing the sophistication and cost of the onboard terminal. So, again, this was not something that Mr. Andrews, sort of in hindsight, invented and said, oh, a Posito could have understood that. No, RDSS, Geostar, understood that at the time that this was an advantage. Also, we know, and one of the arguments was, well, Kosaka is just a self-contained system. No one would have thought to communicate with the outside world from Kosaka. And the board pointed out the fact that, no, actually Kosaka has a couple of different ways in which it communicates wirelessly with the outside world, an alarm system and a premium payment system. Now, it's true that Kosaka does not communicate all of the data for itself, taking all of that information and using it to calculate insurance premiums. That's the part that Kosaka provides. And likewise, for Kosaka, the part that RDSS provides is transfer all the data to the central server before processing, because it's more efficient. So the question is, as Your Honor started, why would one have thought to combine these two things? And we know, and we relied, Liberty relied on the 10K, not as itself independent prior art, but rather, again, to anticipate and rebut this notion that Mr. Andrews. Remind me, did the board in its final written decision rely on the 10K? It did not. So we can't really find that as a basis for the board's fact finding. That's right. But to the extent that Progressive is now asserting that the board's simply hindsight and that Mr. Andrews is all simply hindsight, I think it is fair for the court to understand that the 10K existed at the time. RDSS said, Geostar said, this would have beneficial uses for insurance, lower insurance rates. Of course, that's not enabling, and we're not saying that it is enabling. Kosaka tells us how to do that. The question is, would someone have thought to combine these two things? And again, the board goes through that analysis, and it's on A5022, where it again lays, and this is after it's already talked about the two pieces of prior art and their common basic features that would have been the interrelated teachings. And then it says, and Posita would have understood, that's what Mr. Andrews testifies when we credit that, that it would be advantageous to relocate all that processing from each having a separate computer in each car, each one, of course, each computer would have to be uploaded with any new developments in the software, any improvements with that. Rather than doing all that, and you're basically limited in what kind of computing you can do, if you're going to do new and advanced computing with that, have it all at the central server. RDSS, and again, they credited Mr. Andrews' testimony about that, about what Posita would have understood in terms of the advantage of this, but they also recognized that RDSS said it at the time. This wasn't something new, and that there was nothing that would have discouraged one from doing that. That was really all of the other arguments that Progressive made, were all questions of, oh, well, one wouldn't have done that because of Doppler Radar. The board credited Mr. Andrews' testimony. We know Doppler Radar is actually processed on board before sending the pertinent information anyway. With respect to the gaps that Progressive contends existed and identifies on page 39 of the blue brief, I have to say that these were each addressed by the board, and the suggestion, for example, the first blocked piece, vehicle bus, the board specifically looked at this and said, you know, a vehicle bus, Mr. Andrews testified, a vehicle bus was in existence from 1994, and it was required on vehicles by 1996. So, of course, that was obvious to a person of ordinary skill in the art. Neither CASACA nor RDSS needed to provide that. That would have been obvious. Or a memory. Now, Mr. Andrews testified that it was inherently disclosed in CASACA to store in memory this information before processing. The board didn't agree with inherency, but it did recognize that it would have been obvious. And one reason it would have been obvious is that CASACA recognizes that these computations and the insurance changes can be done subsequently. It does not have to be done instantaneously. As the data is coming in, it can be processed. There are a number of instances where they reference hour by hour, daily, subsequently. All of these suggest that there's going to have to be some kind of storage in memory so that it can be processed later. The board addressed that. Its findings are supported by substantial evidence. The same is true with the others. Wireless transmitter. CASACA has a wireless transmitter. It doesn't use it to translate this kind of data, but that's precisely the kind of data that's transmitted wirelessly by RDSS. It is disclosed in RDSS. A database. RDSS had a database as well. They talked about one of the advantages being the server and processing all this information. Moreover, this is at A5228, that Geostar Central maintains automated files in storage facilities for user identifications for cross-correlation with physical identifications and traffic routing instructions. They could recall that historical files that depict individual truck routes. That's at 5230. There is a database that's disclosed, or at the very least would have been. Obvious. So all of these supposed gaps are addressed in detail. They're supported in the testimony of Liberty's expert, as well as in the references themselves. Can I just double-check one thing with you? Put completely to one side what you've just been talking about, about how you can find all the elements if you look at these two things and you're looking for them. And focus just on this motivation. The way that I, just tell me if this is wrong, but the way that I understand the Board's opinion, the Board has this paragraph on 5022 that says, Liberty argues, notes three things, and the first two are just about what you can find in the prior art, and the third one is the only one that says anything about motivation. And that one, the citation is to Andrew's several paragraphs that I think don't have anything to do with motivation, and then 37 and 38, paragraphs 37 and 38, which are 78, 46, and 47, each use the word advantageous. One uses advantageously, one uses advantage. Is that the sum total of the affirmative basis for motivation? Because then the Board goes on and says, Progressive says, here's a bunch of reasons Progressive says that's not enough, and it proceeds to respond to each of them, but the affirmative case is just that. Which may be enough, I just want to know if there's more. I think it is that in terms of Mr. Andrew's testimony, that is where he talks about this precise advantage that a procedure would have understood. But I would go back to the earlier reference in that paragraph to RDSS, and what it disclosed about reducing the sophistication and cost. That is itself a disclosure of an advantage in the reference itself. So I think there is more than just Mr. Andrew's testimony. I do want to very quickly address the cross-appeal. On the cross-appeal, the real question is whether there was, whether the 358 application is entitled to the priority date of the 358 patent is entitled to the priority date of the 650 application. And we think the Board got it right in its initial institution decision. We think it got it wrong in the final written decision. And just very quickly, what the 650 application does is it describes, the missing element, what is not, doesn't have a written description, is the wireless communication of selected vehicle data that's been stored in memory and then used for insurance. And it has to have both of those elements. It both has to have first been stored in memory before wireless transmission, and then the information that was transmitted wirelessly has to be used to compute insurance. And I refer the Court to pages A167 and 168. That's in the 650 application. It specifically divides into two groups the types of data. The first group is those requiring immediate action. The second group is those not requiring immediate action but necessary for proper billing of insurance. Only the first is transmitted wirelessly to central control for emergency action. With respect to the data that is stored for insurance purposes, all that is disclosed, and this is on page 168, is that it would be recorded in the vehicle recording device for future upload. There is no written description about how that communication happens. And the rest of it acknowledges that one inference is that it was going to be stored in the device, and then that would be somehow connected to the Internet so that the upload would happen that way, not wirelessly. Is there no further questions? Fine. Thank you very much. Good morning. Robert McManus for the Director. The Director's brief focused on procedural issues, most of which have not come up this morning, and to the extent they have, the parties will adequately discuss them. So unless the Court has any questions about the issues about which the Director has weighed in, I know Chief Judge Probst, you mentioned the new grounds issue. My friend indicated he was going to raise that in a different appeal. I'm happy to address them now or wait. I don't see why we wouldn't wait. Then if there are no questions from the Court about the Director's position, then I'll yield my time. Thank you. Oops. Your Honors, what we're left with is a statement from the athlete that these references are interrelated, but they aren't interrelated in the sense that RDSS says nothing about insurance. The only link to insurance was the GeoStar 10K. Liberty has admitted the GeoStar 10K is not enabling, in an effort, I think, to address Judge Serrano's question. And so what we're left with is that there is no reason, not only motivation to combine the references, but also to modify COSACA to make it look something like RDSS, which has nothing to do with insurance. I think Judge Serrano, when you referred to A5022, the Board's decision, the answer you received from Liberty was that basically it's paragraphs 37 and 38, and that's where we think there is a problem. Well, plus that one sentence that's in RDSS, that page 46 of the RDSS document, lines column 1, lines 6 through 9. Let me find that one with you, Your Honors. It's RDSS? 5234, in the appendix. I'm in RDSS. That's what's quoted in, what, point number 1 of the 5022 Board opinion. Oh, okay. It's that. I think my question has suggested that of the items 1, 2, 3, 1, and 2 were just within the prior art and only 3 or on motivation, and I think the answer came back, no, 1 actually. Is it 1? Anyway, the RDSS 1 actually does bear on motivation to combine, not just what's found if you're looking for it in the prior art. Yeah, it's at 5234, and it just basically says, operations requiring extensive processing are performed at Geostar Central, and that was the predicate statement. But it says nothing about the relevance of that to insurance or why anyone would look at COSACA and say, here is a perfectly satisfactory on-vehicle insurance premium determination product. Why? COSACA doesn't say it's inadequate. COSACA doesn't say you need more processing. COSACA doesn't say we have to somehow build a bigger process or we don't have enough for it. Okay, RDSS processes some information, does so at a remote server location, but nothing to do with insurance. So there's nothing that says COSACA is inadequate. In fact, there are reasons why there would be problems with COSACA if it were modified, because we're not just talking about a motivation to combine. We're talking about a motivation to combine and modify COSACA so that these elements would be taken from COSACA's vehicle and placed somewhere else. And one of the problems, two of the problems, I guess, that we mentioned, we spell out in the briefing, one is the fact that COSACA wants a continuous insurance processing and the type of transmission times that are suggested in RDSS are not continuous. They're not the instantaneous flow of information. And second, COSACA wants to have some warning functionality if speed goes over a certain level. That can't be achieved in the RDSS system that talks about, when it references automobiles, transmissions in terms of powers. Now, there may be some type of identification signal that's transmitted regularly, but not in terms of information being sent on a regular basis. These are problems with the modification. And let's remember also, Your Honors, that it's not just COSACA and RDSS. Again, if you go to the chart, there's more than the blue and the green. It's the red boxes that need to be filled in, these gaps. How else would anybody get to the point of the claimed invention, even with COSACA and RDSS, to look at the claim and say, well, I think I can find this somewhere else. Here's a person of ordinary skill saying it could be done. You made these arguments below. We did make arguments below about the lack of these elements, but we think that simply the fact that the board chose to believe the expert testimony in contravention of these are. I think the problem is the board chose to take a piecemeal approach. You can credit expert testimony, but the determination of obviousness is not, can an expert say something about five elements? Can I combine those with two elements that really aren't interrelated? And based on that frame and that mosaic, can I put together what the claimed elements are? That's not a proper legal approach to obviousness, and that's the issue we have. It's the legal error of the board in the way in which it reviewed the evidence. Now, if I can say something about the priority case, which is one where we are at the lead, that's case 1637. Can I ask you one question before you get to that? One of the procedural issues about new ground of rejection, I know we've kind of agreed to postpone discussion on that for a little while. I'm happy to do it now. Well, no, no, I just want to ask you this question. Suppose I thought that there was something to that, but were worried about the question of ultimate materiality on Kosaka and fuzzy logic. Does that come up in the other case? I'm happy to talk about it in the other case. It comes up in the other case as well. Okay, I'm happy to talk about it then. And we will talk about it there. Okay, from the standpoint of priority, and I see I have about three minutes left, here the board got it right, and we are suggesting that the priority issue is one that was determined by substantial evidence, as it's required to be. And the evidence that was used was various elements from the 650 application, figure 4, the text at 161 lines 9 to 11, and the expert testimony, which was credited, Zaskevich's testimony credited over Andrews. Now, if you go to the figure in our yellow brief at page 8, you can see basically what Progressive is trying to construct. I'm sorry, Liberty is trying to construct. On this chart at page 8, we show figure 4, which gives the flow of communication. And remember, the only issue here is really whether there's a wireless communication of data that is the type of data that is required by the claims. All of the data that's collected by the sensors is shown to go up through the blue line into the box where there is cellular satellite transmission or radio frequency transmission of data. What Liberty suggests is that there's a second route for some other kind of data. Hard as they try, and as much as they spend time in their gray brief to lay out a distinction, while there may be a distinction of type of data, and while there is a distinction about the timing of the upload of the data, there is no distinction about the method of transmittal of that data. That data is transmitted wirelessly. And try as they might, they can't point to a specific portion of the 650 application that says, no, future upload doesn't mean future upload wirelessly, which is how the data is channeled, but it means in some other fashion. So the board got it right based on substantial evidence. There is no reason to overturn the board's finding in that regard. Your Honor, with that, I will yield my time unless there are additional questions. Thank you. Okay.